**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **WILMA I. FITZPATRICK** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07cv519-ID** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **AGRICULTURE & INDUSTRIES** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW,** the Defendant Alabama Department of Agriculture & Industries, and makes the following Evidentiary Submission in support of the Motion for Summary Judgment contemporaneously filed herewith.

1.    Deposition Excerpts of Wilma Fitzpatrick.

2.    Deposition Excerpts of Lance Hester.

3.    Affidavit of Teresa Brunson.

4.    Reassignment letter dated July 18, 2006 to plaintiff.

5.    EEOC Charge of Discrimination.

_____/s/_____Emily C. Marks_____
EMILY C. MARKS

_____/s/_____E. Hamilton Wilson, Jr._____
E. HAMILTON WILSON, JR.
Attorneys for the Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2008 I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle-Hodge
207 Montgomery St., Ste. 215
Montgomery, AL  36104-3528

/s/ Emily C. Marks
OF COUNSEL

# DEPOSITION OF WILMA I. FITZPATRICK

## April 22, 2008

## Pages 1 through 156

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

1        your master's?

2    A.  No, no, I didn't receive it.

3    Q.  What year did you graduate ASU?

4    A.  1975.

5    Q.  And when did you finish your coursework for

6        your master's?

7    A.  I think 1978.

8    Q.  Have you had any other formal education --

9    A.  No.

10   Q.  -- other than that?

11   A.  No.

12   Q.  Where was your first job?

13   A.  Department of Agriculture.

14   Q.  Okay.  And you started in 1979?

15   A.  '79.  December of 1979.

16   Q.  What was your first position with the

17       department?

18   A.  A chemist one.

19   Q.  And can you kind of give me your progression

20       through your employment with the Department of

21       Agriculture?  So you became a chemist one in

22       1979.

23   A.  Yes, and I think in 1987 I was promoted to a

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 12

1          chemist two and I believe in 1990 or 1991 a

2          chemist three and then in 2002 a program

3          director with the department in Montgomery.

4    Q.    When you were program director or made program

5          director in 2002, what were you the program

6          director of?

7    A.    Six units.

8    Q.    What were those units?

9    A.    Plant, stockyards and brand/audits and

10         reports.  They go together, slash audits and

11         reports.

12                   MR. WILSON:  What is that?

13   A.    Stockyards and brand/audits and reports.

14   Q.    Audits and reports.

15   A.    Uh-huh (positive response).  Seed lab, the

16         feed and fertilizer lab, gins and warehouse,

17         and supposably ag compliance.

18   Q.    Okay.

19   A.    Uh-huh (positive response).

20   Q.    Why do you say supposedly ag compliance?

21   A.    Because I really -- I don't think I really

22         ever supervised them.  I just don't.

23   Q.    Why didn't you supervise them?

1    Q.    How long have you lived at that address?

2    A.    I believe 16 years.

3    Q.    All right.  And I want to go back to your

4          employment with the Department of

5          Agriculture.  You said you became a program

6          director in 2002.  What was your position

7          after you were a program director?

8    A.    What you mean?

9    Q.    Have you changed responsibilities or positions

10         since 2002?

11   A.    Well, in 2006, those -- June 18th, 2006, those

12         responsibilities I mentioned about at first

13         with the unit managers was taken, just taken

14         from me.  And they gave me some

15         responsibilities for the laboratory, quality

16         assurance for the laboratory and safety,

17         safety issues.  Review their safety issues and

18         quality assurance for the laboratory.

19   Q.    You say that your responsibilities were taken

20         from you.  Were you happy with your new

21         position?

22   A.    What new position?  As a program director?

23   Q.    Well, you said in June of 2006 they took your

Deposition of Wilma I. Fitzpatrick                                    April 22, 2008

1        quality assurance, and what I was actually

2        doing when I was a chemist three is two

3        different things.

4    Q.   Well, you weren't a chemist three, though,

5        right before you became the program director

6        of the --

7    A.   Yes, I was.  Yes, I was, and a supervisor at

8        the pesticide residue laboratory.

9    Q.   In 2002 when you became program director, you

10       were still a chemist three?

11   A.   Yes.  And we had our own quality assurance

12       person in the lab.

13   Q.   Who was that?

14   A.   Cornelia Johnson.

15   Q.   What were her responsibilities in quality

16       assurance?

17   A.   She was -- Well, she had to do -- whenever a

18       new hiree came in, a new person came in, she

19       had to orientate them as to what -- to the

20       laboratory, laboratory safety, what we

21       expected out of a chemist one, how you report

22       your samples, the chain of custody, that sort

23       of thing.

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

1              identification.)

2    Q.   This is a letter dated July 18th, 2006 to

3         you.  Is that the letter you received when you

4         were notified that you --

5    A.   Yes.

6    Q.   -- that your responsibilities were being

7         reassigned?

8    A.   Yes.

9    Q.   And this letter indicates that you would still

10        be a program director, correct?

11   A.   Uh-huh (positive response), program director.

12   Q.   Did you receive any reduction in pay when you

13        were --

14   A.   Huh-uh (negative response).  No, I didn't.

15   Q.   -- when you were reassigned to these duties?

16   A.   No.

17   Q.   Did you receive any reduction in benefits?

18   A.   No.

19   Q.   You did not?

20   A.   No.

21   Q.   Okay.  Did you -- You maintained the same

22        level of responsibilities that you maintained

23        before.  In other words, you went from a

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 39

| | | |
|---|---|---|
| 1 | | program director position to another program |
| 2 | | director position, correct? |
| 3 | A. | Yes, but I didn't supervise.  No supervisory |
| 4 | | responsibilities now.  I have nobody to |
| 5 | | supervise.  I'm just a one-woman show.  Uh-huh |
| 6 | | (positive response). |
| 7 | Q. | In your responsibilities in this reassigned |
| 8 | | position, isn't it true that you are in charge |
| 9 | | of quality assurance over these labs, over -- |
| 10 | | It says:  You will now be responsible for |
| 11 | | quality assurance programs in each of the six |
| 12 | | laboratories for this department, which are |
| 13 | | weights and measures, petroleum, Montgomery |
| 14 | | food and drug, Auburn feed and fertilizer, |
| 15 | | Auburn residue, and the seed lab; isn't that |
| 16 | | correct? |
| 17 | A. | Exactly. |
| 18 | Q. | And so you are in charge of the quality |
| 19 | | assurance for those six labs right now. |
| 20 | A. | Supposably. |
| 21 | Q. | Okay.  Why do you say supposedly? |
| 22 | A. | Because I'm doing a -- I only so far have been |
| 23 | | involved with the three labs, and that's the |

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 49

1       the three laboratories that he wanted me to

2       concentrate on.  And the ISO, I -- I probably

3       would want to attend a class maybe, if I can,

4       this year on the ISO.

5   Q.  Okay.

6   A.  But I don't know what it really entails.  I

7       really don't.

8   Q.  What have you done in your new position?  What

9       do you do on a daily basis?

10  A.  I read up on quality assurance and I take

11      notes.  And I'm trying to do a PowerPoint

12      presentation.  It's all new to me.  Everything

13      is new.

14  Q.  What do you do in a regular day?  Walk me

15      through your day.  When you get to work, what

16      do you do?

17  A.  I turn on my computer.  I surf the Internet

18      for any information I can find.  I look and

19      see what AOAC got, what kind of meetings they

20      got and that sort of thing.

21  Q.  What is the AOAC?

22  A.  Let me see.  AOAC is the acronym for

23      Analytical Organization of Chemists

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 50

1        Association, I believe.

2    Q.    And didn't the Department of Agriculture buy

3          you membership in that organization?

4    A.    Yeah.  We bought the membership because it's

5          so expensive to go on those trip, and you do

6          get a little discount, uh-huh (positive

7          response).

8    Q.    And what are the benefits of membership of

9          that organization?

10   A.    Well, they send me -- e-mail me meetings

11         that -- just e-mail me different meetings.

12         It's up to me to choose whether I want to go

13         to any of them if it applies to what I'm

14         trying to do.

15   Q.    Have you attended any of those meetings?

16   A.    No.

17   Q.    Have you asked for permission to attend any of

18         those meetings?

19   A.    Well, no.

20   Q.    Why not?

21   A.    Because I -- so far, there's not anything that

22         I feel like interests me in going.  It's

23         whether I'm going to accomplish anything by

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 53

1           industry.

2       A.  Right.

3       Q.  Was he talking about his position or the

4           position you were going to be taking?

5       A.  He said program director came with a car.

6           That's where I get that from.

7       Q.  Okay.  Did you tape that conversation?

8       A.  I told you no.  I started in 2006.

9       Q.  All right.  When did you find out you were not

10          going to be getting a car?

11      A.  Well, I never said anything.  I just never got

12          a car.

13      Q.  Okay.  Were you --

14      A.  So I mentioned it to Ronnie Murphy in --

15          sometime in 2003, March of 2003, and I got a

16          car in the next week or two, I believe.

17      Q.  So within a week of the time where you asked

18          about getting a car, you were given a car,

19          correct?

20      A.  Yeah, I was given a car then.

21      Q.  How long did you have it?

22      A.  Two weeks.

23      Q.  And isn't it correct that it was taken -- most

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 54

1           cars were taken away because of the mandate by

2           the governor?

3      A.   Yes.

4      Q.   And that was in April of 2003?

5      A.   Yes.

6      Q.   And that decision came from the governor, not

7           from anybody in the Department of Agriculture,

8           correct?

9      A.   Yes.

10     Q.   You make an allegation in your complaint that

11          when you became the program director and you

12          did not get a car, that that happened because

13          you were a woman.  Is that your allegation?

14     A.   Well, I -- Yes, I do feel that way, Emily.

15     Q.   What makes you feel that way?  What evidence

16          do you have that that decision was made based

17          on your sex?

18     A.   I do feel that when you became a program

19          director, the ones that were there already

20          immediately got a car.  Yeah, I do, because I

21          was told.  Even one of my unit managers was

22          complaining, Tomm Johnson.  He said, when is

23          Wilma going to get a car.  I think in one of

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 55

1           our meetings, when is Wilma going to get a

2           car.  I think it's ashamed she hasn't got a

3           car yet.

4      Q.   When was that meeting?

5      A.   It was sometime in -- The last time we had a

6           roundtable discussion.  I'm going to say --

7           I'm going to say probably -- I can't pinpoint

8           it exactly.  It was in 2003 before I went to

9           Ronnie Murphy and asked about my car.

10     Q.   Which you did in March of 2003.

11     A.   Yes.

12     Q.   Anytime that you had to travel before that,

13          before March of 2003 when you got your car,

14          did you use cars from the pool, from the motor

15          pool?

16     A.   Yes.

17     Q.   Was there ever a time that you needed a car

18          for State business when you did not have

19          access to a State vehicle from the pool?

20     A.   No.

21     Q.   You acknowledge in your complaint that you

22          were finally assigned a car but complain that

23          when the cars were reissued -- this is

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 57

```
 1          place.  Tallassee and -- I can't -- One place

 2          in particular, I just can't think of the city

 3          right now.

 4     Q.   When were the cars reissued?  Do you remember

 5          what year that was?

 6     A.   Well, they pretty much got -- People that

 7          their cars was taken, because it was just a

 8          lot of talk about the cars being taken, they

 9          got them back maybe like in a month or a

10          couple of weeks, I'm believing.  I know we

11          just didn't get our cars back.  And the only

12          black person that got their car back was

13          George Paris.  And I said, George, how did you

14          get your car back?  He said he went down there

15          to general service every day, so they just

16          gave him his keys.

17     Q.   How many miles would you say you travel per

18          year for the State?

19     A.   Less than 20,000, uh-huh (positive response).

20          That was the purpose of taking the cars,

21          because we didn't travel over 20,000 miles,

22          you know.

23     Q.   And the people who had cars reissued, do you
```

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 58

1            know how much they traveled?

2      A.    I don't think it was 20,000 miles.

3      Q.    I'm asking you what you know.  Do you know how
4            much they traveled?

5      A.    No, I don't.

6      Q.    In paragraph 13 of your complaint you say that
7            in April of 2003, you applied for agriculture
8            division director and you were ranked eight
9            out of eight applicants.

10     A.    Uh-huh (positive response).

11     Q.    Do you know who does the ranking?

12     A.    No.

13     Q.    Okay.  Do you know that the person -- the
14           State Personnel Department does the ranking,
15           not the Department of Agriculture?

16     A.    Yes.  Uh-huh (positive response).

17     Q.    Okay.  So you do know that the Personnel
18           Department, that's who makes the decisions
19           about how people are ranked for a particular
20           position.

21     A.    Yes.  I would hope so, yes.

22     Q.    Okay.  You claim that you were qualified for
23           the position and didn't understand how your

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 59

1      ranking could be low.

2   A.   Uh-huh (positive response).

3   Q.   And then claim that you were discriminated

4        against because you're a woman.

5        Are you saying that you were ranked

6        number eight out of eight applicants because

7        you're a woman?

8   A.   A black woman, yes.  Let's say a black woman.

9   Q.   Okay.  All right.

10  A.   Uh-huh (positive response).

11  Q.   Is it for both reasons?  You're making a race

12       claim and a sex discrimination claim on that?

13  A.   Yes.  Yeah, I am.

14  Q.   Okay.  What evidence do you have that you were

15       rated eight out of eight applicants because

16       you are black and because you are a female?

17  A.   Well, I had 20 -- at that time 23 years

18       experience.  And applicants that had less

19       experience, had been in the department with

20       less than five years, some less than 10, was

21       ranked above me.

22  Q.   Who were those people?

23  A.   As I remember, it was -- Tony Cofer is one and

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 60

1          Tomm Johnson is another.  Tomm Johnson had

2          less than three years.

3     Q.   What were the qualifications or the

4          requirements for the position?

5     A.   I don't remember.  I would have to pull the

6          announcement.

7     Q.   Do you know what -- how people -- Do you know

8          what the basis of the rankings were?

9     A.   No.

10    Q.   So you base it solely on the fact that you had

11         more years experience --

12    A.   Yes.  Yes.

13    Q.   -- as a Department of Agriculture --

14    A.   It's just the --

15              MS. MARKS:  Let me finish my

16                   question.

17              THE WITNESS:  Okay.  Uh-huh

18                   (positive response).

19    Q.   You base your claim that you were

20         discriminated against on the basis of your

21         race and on your sex on the fact that you had

22         more years --

23              MS. BATTLE-HODGE:  Objection to the

f626cb69-8139-46e0-a348-6c46b59a130f

Page 61

1                        form of the question.

2        Q.    -- that you had more years experience --

3        A.    Yeah.

4        Q.    -- than other people who were ranked higher

5              than you for the position of agriculture

6              division director.

7        A.    Yes.

8        Q.    Do you have any other evidence that that

9              decision was based on your sex and on your

10             race?

11       A.    No.

12       Q.    And again, you understand that that decision

13             was not made by the Department of Agriculture,

14             correct?

15       A.    I do think they had something to do with it.

16       Q.    Okay.  How do you -- What makes you --

17       A.    I just do.

18       Q.    What makes you think that?

19       A.    Well, program -- when I got program director,

20             there was a lot of opposition against me

21             getting that position.  And I'm told, now, I'm

22             told -- I can't remember who told me, but I am

23             told that during that time that Bishop --

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 75

1          that supervising somebody gives you a higher

2          rating?

3    A.    No.

4    Q.    Is that the only thing that you base your

5          claim that this was a demotion on, the fact

6          that you didn't supervise anybody?

7    A.    It's my personal opinion.

8    Q.    You claim that the reassignment of your duties

9          was in retaliation for you complaining to the

10         ASEA.

11   A.    Yeah.

12   Q.    What do you base that on?  What evidence do

13         you have that that was done to retaliate

14         against you?

15   A.    Well, shortly after we met with ASEA, and

16         Commissioner Sparks apparently found out

17         because I was told he found out that we

18         went -- we call ourselves doing it in

19         secret -- and that's when, you know, he came

20         to my office and told me they were moving me

21         to the lab and ...

22   Q.    You said Commissioner Sparks told you they

23         were moving you to the lab?

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 82

1          because I just -- I'm a little bit nervous

2          about it.

3     Q.   Okay.

4     A.   Uh-huh (positive response).

5     Q.   Besides working on the PowerPoint

6          presentation, have you done anything else in

7          quality assurance and safety?

8     A.   Well, I got some -- I also pull off some

9          safety issues that I would like to address the

10         laboratory with, but I haven't discussed it

11         with Lance yet.

12    Q.   Anything else?

13    A.   That's it.

14    Q.   You claim in paragraph 16 of your complaint

15         that you were moved to a smaller office in the

16         food and drug lab.

17    A.   Uh-huh (positive response).

18    Q.   Can you tell me what the -- I mean, when you

19         were moved to the food and drug lab, that's

20         actually closer to the labs that you are

21         overseeing; isn't that correct?

22    A.   Yes.

23    Q.   Is there anything about the office that makes

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 83

1          it such that you're not able to do your job

2          responsibilities?

3      A.  Well, Lance wanted me to create a library, but

4          there is not enough room to create a library.

5      Q.  In the -- in the --

6      A.  It's big enough for my desk and the computer.

7          And it's not big enough to create a library

8          with books and ...

9      Q.  Did he tell you that the library had to be

10         located in your office?

11     A.  No, he did not.

12     Q.  You acknowledge in paragraph 16 that you were

13         given a car with this position which you call

14         a demotion; is that correct?

15     A.  Yes.

16     Q.  You have a State vehicle now, don't you?

17     A.  Yeah, I do.

18     Q.  How often do you travel?

19     A.  I travel maybe about once or twice every two

20         to three months.

21                  (Defendant's Exhibit 4 was marked for

22                  identification.)

23     Q.  I'm going to show you what I have marked as

Deposition of Wilma I. Fitzpatrick                     April 22, 2008

                                                        Page 89

1    A.   Yes.

2    Q.   What about that lateral transfer do you

3         consider merited or qualified you for any type

4         of a merit raise?

5    A.   Not that it -- I didn't look for a

6         qualification for a merit raise.  It's just

7         new duties entirely.  If you're going to put

8         me with new duties, you should have changed my

9         title as quality assurance manager, give me a

10        chance to apply for the position, and upped

11        the pay grade.

12   Q.   Did you get a pay raise after you became the

13        quality assurance and safety --

14   A.   A pay raise?

15   Q.   -- director, program director?  I mean, you

16        got a raise that year, didn't you?

17   A.   Yeah.  But I got a raise because the position

18        goes -- has so many levels.  So now I've

19        reached my level.  I don't get any more pay

20        raises.

21   Q.   So you've topped out at the -- at your --

22   A.   Yes.

23   Q.   -- pay level?

Deposition of Wilma I. Fitzpatrick                                April 22, 2008

Page 90

1    A.    Yeah.  Yes.  Yes.

2    Q.    But you still get across-the-board

3          adjustments; isn't that correct?

4    A.    Yes.  Yes.

5                (Defendant's Exhibit 5 was marked for

6                identification.)

7    Q.    I'm going to show you what I have marked as

8          Defendant's Exhibit -- well, I've numbered

9          them wrong; I've got them out of order -- 5,

10         Defendant's Exhibit 5.  Do you agree that that

11         indicates that you got a five percent

12         across-the-board adjustment in September of

13         2006?

14   A.    Yes.

15   Q.    And that was a few months after you became the

16         quality assurance and safety program director.

17   A.    Yes.

18                (Defendant's Exhibit 6 was marked for

19                identification.)

20   Q.    I'm going to show you what I have marked as

21         Defendant's Exhibit Number 6.  This indicates

22         that you got a three and a half percent

23         across-the-board adjustment in September of

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 93

1    A.   Because he put me over five laboratories, two

2         I -- three -- Well, actually I only knew about

3         one, pesticide, because that's where I came

4         from.  And that's -- You know, I -- I don't

5         know anything about these labs, especially

6         petroleum and weights and measure.  I don't

7         have a clue as to what you do.

8    Q.   Well, you have a chemistry background, don't

9         you?

10   A.   Yes.

11   Q.   And you have been offered opportunities to

12        visit labs and do training on quality

13        assurance and safety, haven't you?

14   A.   Yes.  Uh-huh (positive response).

15   Q.   Okay.  And what about that situation makes you

16        think that it was designed for failure?

17   A.   Because as I said, I don't know anything about

18        most of those laboratories they put me over.

19   Q.   Is it your contention that your job is not

20        meaningful?

21   A.   No, I don't think it's that meaningful.

22   Q.   So you do think that the position of quality

23        assurance and safety is a position that has

f626cb69-8139-46e0-a348-6c46b59a130f

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 97

1    Q.   Okay.  And you don't know for the other two

2         labs.

3    A.   I don't know for the other two labs.

4    Q.   Okay.  Have you tried to find out?

5    A.   No, because I was told to concentrate on the

6         three labs.

7    Q.   Well, I know you were told to concentrate on

8         those.  Were you ever told to ignore them?

9    A.   No, I wasn't told to ignore them.  I was told

10       to concentrate on the other three labs.

11       That's what I've been doing.

12    Q.   Okay.  Even though you were told to

13       concentrate on the other two labs, why have

14       you not ever tried to find out if somebody is

15       doing some quality assurance and safety

16       oversight in the other two?

17    A.   Well, I don't -- I have to assume if you --

18       This is my opinion.  If it's a laboratory --

19       it's a State laboratory, you have to be doing

20       some quality assurance and safety.  You're

21       working with gasoline.  You got to have

22       something already in place.

23    Q.   So you agree, then, that quality assurance and

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 98

1                  safety is very important for the labs.

2       A.   Yeah, but it's not on an individual basis.

3       Q.   And you're the program director for quality

4            assurance and safety.

5       A.   That's what they say.

6       Q.   And you have not found out if --

7       A.   No.

8       Q.   -- those two labs --

9       A.   No.

10                      MS. MARKS:  Let me finish my

11                         question.

12                      THE WITNESS:  Okay.

13      Q.   And you have not found if those two labs have

14           somebody who is doing quality assurance and

15           safety oversight.

16      A.   No.

17      Q.   In paragraph 19 of your complaint you say that

18           you applied for a division director position,

19           and then you found out in September of 2006

20           that you did not receive it.  You claim that

21           there were two positions available.  Lance

22           Hester received one and Tony Cofer received

23           the other.

f626cb69-8139-46e0-a348-6c46b59a130f

1   A.   Yeah.

2   Q.   You claim to be the most qualified person for

3        the position that Tony Cofer got.

4   A.   Yeah.

5   Q.   What do you base that on?

6   A.   Well, my experience.  I got more experience

7        than he has.  I don't know what his

8        educational background is, but I believe he's

9        probably just got a B.A. or B.S. just like I

10       got.

11  Q.   But you don't know that.

12  A.   And I -- No, I don't know that.

13            And then what else.  Just more

14       experience.

15  Q.   Okay.  So you base your claim -- You have here

16       that you were not promoted on the basis of

17       sex.

18  A.   Yeah.  Yes.

19  Q.   You claim -- You base that allegation on the

20       fact that you have more years of experience at

21       the Department of Agriculture than Tony Cofer.

22  A.   Yes.

23  Q.   Do you know what his work experience is?

1    A.    No.

2    Q.    And you've already said you don't know his

3          educational background.

4    A.    No.

5    Q.    You said in paragraph 21 of the complaint that

6          it is clear that the plaintiff is the most

7          qualified person for the second position, the

8          position that Tony Cofer received.

9    A.    Yes.

10   Q.    Okay.  Other than your years of experience --

11   A.    Uh-huh (positive response).

12   Q.    -- you don't have any knowledge that you are

13         more qualified than Tony Cofer for that

14         position, correct?

15   A.    No.

16   Q.    That's the only information you have?

17   A.    Yes.

18   Q.    Do you have any information that supports your

19         allegation that the decision to promote Tony

20         Cofer to that position and not you was based

21         on your sex?

22   A.    No, I don't have any evidence.

23   Q.    Do you know who promoted Tony Cofer?

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 114

1    Q.    In paragraph 28 of your complaint you claim

2          that you were discriminated against on the

3          basis of your race when the -- in 2000 --

4          after 2003 when -- after the governor's

5          mandate came out removing State cars from

6          people who did not drive a lot.

7    A.    Uh-huh (positive response).

8    Q.    That once the cars were returned to employees

9          that you did not receive your car back.  And

10         you claim that cars were reissued on the basis

11         of race.

12   A.    I believe so.

13   Q.    What do you base -- What evidence do you have

14         that race was a factor in determining who got

15         their cars back, their State cars back?

16   A.    Okay.  None of the blacks got theirs back.

17         And I'm saying none of the blacks, Annie

18         Patterson, John Crayton, myself and, as I

19         said, George Paris.  But as I told you

20         earlier, he kept going to general service

21         every day, and they gave him his car back.

22         That's what he told me.

23   Q.    Okay.  And when were the cars -- What period

f626cb69-8139-46e0-a348-6c46b59a130f

Deposition of Wilma I. Fitzpatrick                      April 22, 2008

Page 115

1    of time are we talking about?  Because you

2    obviously have a car now.  I mean, when the

3    cars were reissued ...

4  A.   So they were taken from us in 2003.  I think

5       in a couple of months, everybody had their car

6       back.

7  Q.   Everybody did.

8  A.   Everybody except the blacks.  I'm going to say

9       the blacks.  With higher positions, you know,

10      a supervisory position within the department.

11 Q.   Who is Dana Wallace?

12 A.   He -- I don't -- Dana Wallace was at -- When I

13      met Dana Wallace, he was an executive

14      assistant.  Now, I don't know what he is now.

15      He has a merit-system job now, but that's when

16      I met him.

17 Q.   Did Dana Wallace get a State vehicle back when

18      they were reissued?

19 A.   I have no idea.  I don't think Dana was in the

20      meeting with Ronnie Murphy when he called all

21      his program directors and unit managers

22      together.  I don't think I ever was in a

23      meeting with Dana Wallace until of late.

f626cb69-8139-46e0-a348-6c46b59a130f

Deposition of Wilma I. Fitzpatrick

1    Q.    Well, I'm not asking you about a meeting.

2    A.    Uh-huh (positive response).

3    Q.    I'm asking you about whether you know if Dana

4          Wallace got a car --

5    A.    No, I don't.

6    Q.    -- got a car reissued.

7    A.    No, I don't.

8    Q.    Okay.  So you don't know who got a car

9          reissued.

10   A.    No, I don't.

11   Q.    Okay.  How do you know that only white people

12         got cars reissued, then, if you don't know who

13         got cars back?

14   A.    I know that they took cars from just about

15         everybody, because they were commuting to

16         work.  And they got the cars back because you

17         could see when you drove in who got out of

18         what car.

19   Q.    Okay.  But you don't know what exact

20         individuals had cars reissued to them after

21         the governor's mandate that anybody who drove

22         less than 20,000 miles a year should have

23         their cars removed.

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 117

| | | |
|---|---|---|
| 1 | A. | I only know that John, Annie, and myself did |
| 2 | | not get our cars back, and we're all black. |
| 3 | Q. | Okay.  Do you know any whites who didn't get |
| 4 | | their cars back? |
| 5 | A. | I don't know any whites. |
| 6 | Q. | But you don't know who got their cars back. |
| 7 | A. | No, I don't. |
| 8 | Q. | So it's an assumption on your part. |
| 9 | A. | Yes. |
| 10 | Q. | Okay.  You don't have any evidence that cars |
| 11 | | only went or were reissued -- |
| 12 | A. | No, I don't. |
| 13 | Q. | -- to black (sic) people. |
| 14 | A. | I don't. |
| 15 | Q. | And you agree with me that you have a State |
| 16 | | vehicle now. |
| 17 | A. | I do have a State vehicle. |
| 18 | Q. | Do you know if John Crayton has a State |
| 19 | | vehicle? |
| 20 | A. | He has a State vehicle. |
| 21 | Q. | Do you know when he got his State vehicle? |
| 22 | A. | No, not really. |
| 23 | Q. | Other than your claim that you did not get |

Deposition of Wilma I. Fitzpatrick                          April 22, 2008

Page 120

1    Q.   That's correct?

2    A.   Yes.

3    Q.   When you became program director in 2002 and

4         were not immediately given a car, you're

5         claiming that that happened because you're

6         black and a woman.  I mean, you've made the

7         sex discrimination claim --

8    A.   Yes.

9    Q.   -- but you're also claiming it's based on your

10        race.

11   A.   Yes.

12   Q.   What is your evidence of that?

13   A.   My assumption.

14   Q.   Okay.  So you have no evidence of it other

15        than an assumption that you have made.

16   A.   Yes.

17   Q.   Okay.  When Tony Cofer got the promotion to

18        division director and you did not, we know

19        you've made that sex discrimination claim

20        based on that and now you're telling me it's

21        also a race discrimination claim.  What

22        evidence do you have that Tony Cofer got that

23        position and you did not because you're black?

f626cb69-8139-46e0-a348-6c46b59a130f

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 121

1    A.    No evidence.

2    Q.    No evidence.

3    A.    No.  My assumption.

4    Q.    Okay.  On page 8 of your complaint, paragraph

5          31, you say:  In taking the above-described

6          action, defendant retaliated against plaintiff

7          when she filed a complaint with the State

8          Employee Association against defendant for

9          discriminatory practices.  And then in the

10         next paragraph you make mention of ongoing

11         retaliation.

12               What instances are you talking about,

13         factual instances, that you claim constitutes

14         retaliation for you because you made a

15         complaint to the ASEA?

16   A.    Well, removing me from my office and putting

17         me in -- removing me from the main building to

18         the laboratory is one, I think.

19   Q.    That's moving your physical office?

20   A.    Uh-huh (positive response.

21               And then the second one was stripping me

22         of my responsibilities, my previous

23         responsibilities.

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 122

1    Q.    And you're talking about your reassignment to

2          the quality assurance and safety --

3    A.    Exactly, yes.

4    Q.    -- position in 2006; is that right?

5    A.    Yes.

6    Q.    Okay.  Is that all?  Are those the only

7          basis -- the only retaliation claims you're

8          making?

9    A.    Well, an incident happened, I think it was in

10         2005, when the commissioner came to my

11         office.  And it was about wanting to move

12         cabinets into my office when I was in the main

13         building, and I told him -- file cabinets.

14         And I told him no, because it was an invasion

15         of my privacy.  I had my unit managers in

16         there from time to time with meetings and

17         stuff, and that was going to be an invasion of

18         privacy and ...

19   Q.    How is the commissioner asking to move file

20         cabinets into your office an invasion of

21         privacy?

22   A.    Because if I'm in a meeting and they need

23         something out of the file cabinet, they would

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 129

1           I'm moving on to retaliation, though.

2      A.   Okay.

3      Q.   You're claiming in 2006 you made a complaint

4           to the ASEA and that after that happened,

5           people in the Department of Agriculture

6           started retaliating against you.  What

7           retaliation are you talking about other than

8           the moving of the office and the reassignment

9           of your duties?

10     A.   Well, the retaliation I'm talking about is

11          still moving me from my original office and

12          changing my duties.  That's my retaliation

13          complaint right there.

14     Q.   All right.  You don't have any other

15          complaints of retaliation.

16     A.   No.  No.

17     Q.   So when you talk about in paragraph 32 ongoing

18          retaliation against the plaintiff, those are

19          the only two instances you're talking about.

20     A.   Well, nothing has happened to me since.

21     Q.   When you were reassigned your duties in 2006

22          to be in charge -- the program director for

23          quality assurance and safety, you did not

Deposition of Wilma I. Fitzpatrick                    April 22, 2008

Page 130

1          receive a reduction in pay, correct?

2     A.   No.

3     Q.   You did not receive a reduction in benefits,

4          correct?

5     A.   No.  No.

6     Q.   The only -- The physical office space, you

7          said that you were moved over to the lab.

8     A.   Yes.

9     Q.   Is there anything -- Do you lack any tools or

10         space that you need to perform your job?

11    A.   Any tools or space?  No, not right now.

12    Q.   And your office, is that equipped for you to

13         perform your job?

14    A.   Yes, without the library and the accumulation

15         of data.

16    Q.   Okay.  And I know you told me that Lance

17         Hester wants you to start a library but did

18         not mandate that that library be contained

19         within your office; is that right?

20    A.   Where am I going to put it?

21    Q.   My question was, did he tell you that the

22         library had to be put in your office?

23    A.   Yes.

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  NORTHERN DISTRICT

 4

 5   CIVIL ACTION NUMBERS

 6   2:07 cv626

 7   2:07 cv519

 8   2:07 cv548

 9

10   JOHN L. CRAYTON

11   WILMA FITZPATRICK

12   SHANNON BURTON,

13       Plaintiff(s),

14   vs.

15   ALABAMA DEPARTMENT OF

16   AGRICULTURE & INDUSTRIES,

17       Defendant(s).

18              DEPOSITION TESTIMONY OF:

19                  LANCE HESTER

20   May 6, 2008

21   9:55 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393
```

**Lance Hester**

Page 116

```
 1    director.  The title has changed somewhere in

 2    the time frame there -- I'm not sure exactly

 3    when the title has changed.

 4         Q.    So are you saying that at the time

 5    Ms. Fitzpatrick supervised him, he was not a

 6    program director?

 7         A.    I'm not sure.

 8         Q.    Does she supervise those same

 9    position individuals today?

10         A.    No.

11         Q.    What has changed?

12         A.    The responsibilities have

13    changed.  We needed a qualified person to work

14    with and coordinate with our laboratories, to

15    upgrade our safety issues, to upgrade our

16    quality issues, to upgrade our certification

17    issues.

18         Q.    So with that change, all of these

19    people she supervised at one time, did they come

20    from under her supervision at that time?

21         A.    Yes.

22         Q.    When was that?

23         A.    There was -- she initially was
```

**Lance Hester**

1    assigned some of the laboratory work in January

2    of 2006, but as far as a full move into that

3    position, I believe it was later in the year,

4    maybe June or July of '06.

5         Q.    When did she move from the

6    position that she had when you first came in

7    2003 to the position that she currently has, the

8    position that you are talking about that she

9    moved to now?

10        A.    Her title hasn't changed at all.

11        Q.    She's still program director?

12        A.    She's still program director.

13        Q.    When did her duties change?

14        A.    Some of her duties changed in

15   January of '06.

16        Q.    Would you state again why they

17   changed?

18        A.    In January of '06?

19        Q.    Yes.

20        A.    Because of a need, as a matter of

21   fact, we had already had two or three complaints

22   filed in our seed laboratory with risk

23   management prior to that.  There was a need for

**Lance Hester**

Page 118

1   us to be -- have someone to oversee our safety

2   issues in our laboratory and quality assurance

3   in our laboratories and there are new

4   requirements coming along for certification

5   that's also a part of our assignment in January

6   of 2006.  Those were, at that time, were added

7   to her current duties.

8        Q.    Who does she supervise now?

9        A.    She doesn't have direct

10  supervision with anyone.

11        Q.    So she has no supervisory --

12        A.    No direct supervision of anyone.

13        Q.    You mentioned that the laboratory

14  responsibilities were removed; is that correct?

15  Tell me what you said about the laboratory.

16        A.    In January of '06 she was assigned

17  some new duties to go along with her previous

18  duties that included the laboratories, the

19  safety, quality assurance, certification.

20        Q.    So are you saying she was not --

21        A.    At that time she still maintained

22  all of her supervisory that she had had before.

23        Q.    At what time?

**Lance Hester**

Page 120

```
 1          A.      At that time.

 2          Q.      Then are you saying that in

 3     whatever month, May, June, some six months

 4     later, those supervisory responsibilities were

 5     removed; is that what you are saying?

 6                  MR. WILSON:  Object to the

 7     form.

 8          A.      Yes.

 9          Q.      (By Mrs. Battle-Hodge) Who made

10     that decision?

11          A.      The decision was made.  I talked

12     with my supervisor, Deputy Commissioner Ronnie

13     Murphy, we evaluated the needs and the

14     laboratories, and we felt that was the best for

15     the department and with Ms. Fitzpatrick's

16     background.  We felt like that was a place where

17     she could use her background in these areas and

18     laboratories.

19          Q.      Was this decision made out of a

20     meeting, or how did that decision come about?

21          A.      I'm sure we talked about it a

22     number of times and came to that decision.

23          Q.      Who decided that she should not
```

**Lance Hester**

```
 1    supervise anyone?
 2                    MR. MARKS:  Object to the
 3    form.
 4         A.     It wasn't a decision that she need
 5    not supervise anyone.  The decision was the need
 6    is great in these areas, and we needed a person
 7    of her background to be in that position and
 8    handle all of the things that the laboratory is
 9    faced with, that's all.
10         Q.     (By Mrs. Battle-Hodge) Does a
11    program director normally have a supervisory
12    responsibility?
13         A.     It's a management position.  It
14    can be a management of people or it can be a
15    management of programs.  So in Ms. Fitzpatrick's
16    case it's a management of programs.
17         Q.     You testified that the duties that
18    you changed, Ms. Fitzpatrick's, were some duties
19    and things the department really needed?
20         A.     Yes.
21         Q.     You say that there was a need for
22    safety in the laboratories and a person to
23    oversee the laboratories, and the food safety
```

1    and quality control in the laboratories?

2         A.    That's correct.

3         Q.    Who did that before?

4         A.    It would be various people at

5    different times in the laboratories.  They may

6    assign somebody to look at this or look at that,

7    but there was no formal program.  Therefore a

8    lot of it was falling through the cracks.

9         Q.    When you say various people?

10        A.    For instance, it might have been a

11   Chemist 3 and another -- whoever was available

12   at the time and some of them, the laboratory

13   directors handled it or assigned out parts of

14   it.  But again, there was no coordinated effort

15   to make sure that -- again, we already had

16   complaints in our seed laboratories that filed

17   risk management dealing with safety issues in

18   the state chemical laboratory.  Also the issue

19   of certification is -- used to not even be

20   thought about, but now one of the

21   responsibilities for our laboratory is to

22   maintain the ability for us to ship things

23   overseas.  ISO certification, international

**Lance Hester**

Page 123

1    standards, will soon be a requirement of any

2    laboratory that's going to do analysis for parts

3    overseas. So that's an emergent one.  The

4    safety and quality assurance are every day, but

5    the emerging ones are the certification and it's

6    a long drawn out process to get ISO-certified.

7    There are also other certifications dealing with

8    something that is a fallout of 9/11, that is

9    food and emergency response network.  That is a

10   national organization that we currently have

11   certification to do certain type analysis in

12   case of a national event.  There are certain

13   types of samples that we can analyze now.  We

14   have to maintain certification in order to be a

15   member of that, be a part of it, so we can use

16   those services in other states and the FDA and

17   federal government should we need them.

18         Q.      What type qualifications does

19   Ms. Fitzpatrick have that warrant you moving a

20   program director to safety and quality?

21         A.      She spent a number of years as a

22   chemist.  She moved way up.  And I don't know

23   how long she had been a Chemist 3, probably more

**Lance Hester**

Page 124

1    than 15, 20 years.  She had been a Chemist 3 for

2    a number of times.  The issues in the laboratory

3    safety-wise, she has abilities, and she has

4    experience dealing with those type issues.

5         Q.     So she was a program director at

6    the time you transferred her and still is a

7    program director; is that correct?

8         A.     That's correct.

9         Q.     You testified that individuals

10   that were not at the level of program directors,

11   you usually give those type duties to those

12   individuals who are not at the level of program

13   director; is that correct?

14                    MR. WILSON:  Object to the

15   form.

16                    MRS. MARKS:  Object to the

17   form.

18        A.     Could you restate that?

19        Q.     (By Mrs. Battle-Hodge) The safety

20   and quality, are those duties that ordinarily

21   you would give to someone who is not a program

22   director?

23        A.     Ordinarily means we didn't have a

**Lance Hester**

1    program.  It was just a piecemeal program.

2    That's why we felt the need for a person, a

3    position to deal with these issues.

4         Q.    I'll move on from that.  Have you

5    ever talked to Ms. Fitzpatrick about any

6    problems she might be experiencing or hasn't

7    experienced in her employment as the person over

8    safety and quality?

9         A.    We've talked about her position

10   and what's expected, and offered any assistance

11   we could as far as the, you know -- we realize

12   there is going to be a learning curve.  We

13   realize that she's going to be exposed to some

14   things she hasn't been exposed to.  Yeah, we've

15   talked numerous times about what our goal was

16   and what we wanted to accomplish.

17        Q.    Did you-all come to a plan on how

18   to take care of those concerns?

19        A.    Certain aspects, certainly not all

20   that needs to be done, but certain aspects.

21        Q.    What aspects?

22        A.    Maintaining a manual for what each

23   lab was doing quality assurance-wise, and

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **WILMA I. FITZPATRICK** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07cv519-ID** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **AGRICULTURE & INDUSTRIES** | ) | |
| | ) | |
| **Defendant.** | ) | |

### AFFIDAVIT OF TERESA BRUNSON

Before me, the undersigned authority, on this day personally appeared Teresa Brunson, who being by me first duly sworn, deposed and stated upon her oath the following:

My name is Teresa Brunson.  I am over the age of twenty-one (21) years and I have personal knowledge of the following information.

Presently, I am a Departmental Personnel Manager I, and serve the Alabama Department of Agriculture and Industries as Personnel Director.  At the time that Mr. Cofer was hired to become an Agriculture Division Director, I was a Personnel Assistant III, but still served the Alabama Department of Agriculture and Industries as the Personnel Director.  I have been employed with the Department for over 3 years.  My office is in the Richard Beard Building located on Federal Drive.

In my capacity as Personnel Director, I maintain employee personnel files and handle the personnel chores for the Department.  Mr. Cofer was hired to be an Agriculture Division Director over Pesticide Management for the following reasons:

1.      Since 1998, he has worked in Pesticide Management as a Pesticide Administrator, a position which was changed to Agriculture Program Director in 2001;

2.    He reported to and formally assisted the previous Agriculture Division Director, Dr. John Bloch;

3.    Immediately upon the retirement of longtime Division Director, Dr. John Bloch, he was made the interim director to continue the regulatory functions of Pesticide Management;

4.    He was number three (3) on the State Personnel Register for this position; Ms. Fitzpatrick was number five (5); An applicant only has to be in the Top 10 to be appointed, and the ranking is solely handled by the Alabama State Personnel Department;

5.    Prior to working at the Department of Agriculture and Industries, he served as a Senior Environmental Scientist at the Alabama Department of Environmental Management.

After a review of the other individuals on the register, and their education and work experience, an executive decision was made to hire Mr. Cofer for the Division Director position based on his unique qualifications and work experience.


_____
TERESA BRUNSON


STATE OF ALABAMA

COUNTY OF MONTGOMERY

Before me, the undersigned Notary Public, did personally appear Teresa Brunson who states to me that she is aware of the contents of the foregoing Affidavit, and that she did execute it voluntarily.

SWORN TO and SUBSCRIBED before me on this the 2nd day of _September_ 2008.

_____
NOTARY PUBLIC

2

Rec'd 7/18/

# STATE OF ALABAMA
## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

July 18, 2006

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-033

Ms. Wilma Fitzpatrick, Program Director
Department of Agriculture and Industries

Dear Ms. Fitzpatrick:

This is notification that your duties and responsibilities are being reassigned effective immediately. As Program Director, you will now be responsible for Quality Assurance Programs in each of the six Laboratories for this department, which are: Weights and Measures Lab, Petroleum Lab, Montgomery Food and Drug Lab, Auburn Feed & Fertilizer Lab, Auburn Residue Lab, and the Seed Lab.

As an essential function of your new duties, you are to report to and communicate with your immediate supervisor, Mr. Lance Hester, Division Director, of the functions of each lab as instructed.

We are please to have an employee with your background provide these important quality assurance and related programs. We look forward to the positive impact that you will have upon these labs, in this area.

Sincerely,

Lance Hester, Director
Food Safety Division

*"We provide employment & services without discrimination."*

5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2006-05210 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Wilma I. Fitzpatrick** | **(334) 284-0610** | **03-03-1953** |

| Street Address | City, State and ZIP Code |
|---|---|
| **3309 Cross Creek Drive, Montgomery, AL 36116** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **AL DEPT OF AGRICULTURE & INDUSTRIES** | **201 - 500** | **(334) 240-7100** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1445 Federal Drive,  Montgomery, AL 36107** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **07-20-2006** | **09-01-2006** |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the employer name above as a Chemist I on December 14, 1979.  On June 23, 2006, I complained to the Alabama State Employee Association that Blacks were being discriminated against by the employer named above.  On or about July 20, 2006, I was required to move to a less desirable office space, suffered a complete change in my job responsibilities without an increase in my wages and not given any training for the new duties I am now required to perform.  It appears that my employer has placed me in a position wherein I have been doomed for failure.  On or about September 1, 2006, I was not promoted to the position of Division Director.  I was informed that I was removed from my former office space to make room for new hires.  I have not been given a reason as to why I was not promoted.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended in retaliation to my complaint of the overall treatment of Blacks in the workplace.

RECEIVED
EEOC

SEP 2 7 2006

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | |
| Sep 27, 2006                    W. I. Fitzpatrick | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date                    Charging Party Signature | |